**SOUTH SHORE HOSPITAL d/b/a South Shore Hospital Transitional Care Center Plaintiff,**

v.

**Tommy G. THOMPSON, Secretary of the U.S. Department of Health and Human Services Defendant.**

No. Civ.A. 99–11611–JLT.

United States District Court, D. Massachusetts.

Jan. 3, 2002.

Peter R. Leone, McDermott, Will & Emery, Boston, MA, for plaintiff.

Thomas E. Kanwit, U.S. Attorney's office, Boston, MA, for defendant.

### *MEMORANDUM*

TAURO, District Judge.

### *INTRODUCTION*

Plaintiff South Shore Hospital Transitional Care Center ("South Shore"), is a 25–bed skilled nursing facility ("SNF"), which opened in January 1995. South Shore provides skilled nursing care to inpatients and those needing such care for short term recovery periods.

South Shore brought this suit against the Secretary of the U.S. Department of Health and Human Services ("Secretary") to review a decision of the Medicare Provider Reimbursement Review Board ("Board"). That decision denied South Shore "new provider" status, making it ineligible for reimbursements for its start-up costs.

### *BACKGROUND*

The Medicare Act establishes a system of health insurance for the aged and disabled.[1] Eligible beneficiaries are entitled to have payment made by Medicare on their behalf for services provided by a participating SNF.[2] In order to be approved for participation in the Medicare program as a SNF, a provider must meet the requirements of 42 U.S.C. § 1395i–3. In particular, it must be:

> an institution (or a distinct part of an institution) which—(1) is primarily engaged in providing to residents—(A) skilled nursing care and related services for residents who require medical or nursing care, or (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, and is not primarily for the care and treatment of mental diseases.[3]

Under the Medicare Act and regulations, the Secretary is generally required to reimburse providers for Medicare's share of the total cost of Provider operations, so

---

1. *See* 42 U.S.C. §§ 1395c *et seq.*

2. *See* 42 U.S.C. §§ 1395g, 1395cc.

3. *See* 42 U.S.C. § 1395i–3(a).

that non-Medicare patients are not required to bear the costs related to services furnished to Medicare patients.[4]

The Secretary, via the Health Care Financing Administration ("HCFA"), reimburses SNF's for "reasonable costs" incurred in providing SNF services to eligible Medicare beneficiaries, subject to "routine cost limits."[5] New providers are permitted to request an exemption from the "routine cost limits" to assist the new facility with the costs associated with the initial development of the facility.[6]

The HCFA has defined a new SNF or provider as: "a provider of inpatient services that has operated as the type of SNF (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years."[7] The three year period is referred to as the "three year look back period."[8]

In Massachusetts, health care facilities are not only regulated by Federal law, but also by Massachusetts law. Massachusetts health planning law limits the total number of long-term care beds available in the Commonwealth and requires facilities to obtain a Determination of Need ("DON") prior to beginning operation of an SNF.[9]

In the instant case, in order to comply with Massachusetts law, South Shore needed to acquire a DON from another facility in the same Health Service Area to open a SNF.[10] South Shore decided to purchase the DON rights of Prospect Hill, a formerly certified Medicaid Nursing Facility ("NF") located in the same Health Service Area.[11] Prospect Hill was a minimal care, 40–bed level III[12] nursing facility that had been in receivership since March 1993 and ultimately went out of business in December 1993.[13] South Shore purchased the DON rights to 40 beds once owned by Prospect Hill from Prospect Hill's receiver on January 24, 1994.[14]

4.  See 42 C.F.R. § 413.5.

5.  See 42 U.S.C. §§ 1395x(v)(1)(A) and 1395yy(d).

6.  See 42 C.F.R. § 413.30(e). This regulation has been redesignated as 42 C.F.R. § 413.30(d). It is cited herein as it appeared at the relevant times.

7.  Id.

8.  Pl.'s Mot. for Summ. J. at 4.

9.  See Mass. Gen. Laws ch. 111 § 25C.

10.  Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 7–8; Administrative Record (A.R.) 125–126.

11.  Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 7–8.

12.  Massachusetts law provides classification for state licensed nursing homes in the Commonwealth ranked by levels I–IV. At issue here are Level II (South Shore's Transitional Care Center) and Level III (Prospect Hill) facilities. A Level II facility is a Skilled Nursing Care Facility defined as a "facility ... that provide[s] continuous skilled care and meaningful availability of restorative services and other therapeutic services in addition to the minimum, basic care and services required for patients who show potential for improvement or restoration to a stabilized condition or who have a deteriorating condition requiring skilled care". A Level III facility, by contrast, is a Supportive Nursing Care Facility, defined as a "facility ... that provide[s] routine nursing services and periodic availability of skilled nursing, restorative and other therapeutic services, as indicated, in addition to the minimum, basic care and services required for patients whose condition is stabilized to the point that they need only supportive nursing care, supervision and observation". See 105 C.M.R. 151.020.

13.  Def.'s Mem. in Opp'n to Pl's Mot. for Summ. J., at 7.

14.  Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J., at 8.

South Shore acquired only the intangible DON rights from Prospect Hill.[15] No tangible assets were purchased and no patients were transferred to South Shore.[16]

On May 17, 1995, South Shore requested that the Health Care Financing Administration ("HCFA")[17] grant it a new provider exemption,[18] regarding the routine cost limits.[19] The HCFA denied the request and South Shore appealed that decision to the Board. A hearing before the Board was held on July 10, 1998.[20] The Board affirmed the denial of the new provider exemption, with one member dissenting.[21]

The Secretary declined to review the Board's findings, thus making the decision final and subject to judicial review pursuant to the Administrative Procedure Act ("APA"), as of June 24, 1999.[22] Pursuant to 42 U.S.C. § 1395oo(f)(1), Provider had 60 days from the day the decision became final to file a civil action in United States District court in the District in which the provider of services (South Shore) is located. South Shore filed its complaint in a timely manner, pursuant to the statute.

Secretary and South Shore both moved for summary judgment. Both motions are currently before this court.

## DISCUSSION

South Shore moves for summary judgment on the basis that the Board's finding of a change of ownership is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[23] The Secretary argues that he is entitled to summary judgment because administrative decisions are entitled to great deference by a district court.

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[24] The moving party must make a showing that there is no material fact which requires resolution at trial; upon this showing the burden shifts to the non-moving party to show that there is a triable issue of fact.[25] "[A]n issue of fact is 'genuine' if it may reasonably be resolved in favor of either party.[ ] '[M]aterial' facts are those which possess the capacity to sway the outcome of the litigation under the applicable law."[26] "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [courts] to determine whether either of the

---

**15.** Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J., at 8.

**16.** *South Shore Hospital Transitional Care Center South Weymouth, MA Provider No. 22–5664 v. Intermediary—Blue Cross and Blue Shield Association/C & S Administrative,* 1999 WL 297452, at *1 (P.R.R.B.).

**17.** HCFA is the administrative body which makes decisions on behalf of the Secretary of Health and Human services regarding Medicare payments.

**18.** 42 C.F.R. § 413.30(e).

**19.** 42 C.F.R. §§ 413.30(a)(1) and (2) allows Medicare to establish limits on SNF costs recognized as reasonable in determining Medicare program payments. As a general principle reimbursable provider costs may not

exceed the costs Medicare estimates to be necessary for the efficient delivery of needed health care services.

**20.** *South Shore* at *1.

**21.** *Id.*

**22.** *See* 5 U.S.C. §§ 701–706.

**23.** Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J., at 15. *See also* 5 U.S.C. § 706(2)(A).

**24.** *See* Fed.R.Civ.P. 56(c).

**25.** *See Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997).

**26.** *Id.*

parties deserves judgment as a matter of law on facts that are not disputed." [27]

## A. Standard of Judicial Review

Pursuant to 42 U.S.C. § 1395oo(f) the final decision of the Secretary is subject to judicial review in federal district court. As noted above, this decision became final on June 24, 1999.

■ Judicial review of final agency decisions on Medicare provider reimbursement disputes is governed by 42 U.S.C. 1395oo(f), which incorporates the Administrative Procedure Act ("APA").[28] The APA requires that a court set aside an agency action, finding or conclusion only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ... [or] is unsupported by substantial evidence...." [29] When a district court reviews agency action under the "arbitrary and capricious" standard, it must "determine whether the decision was based on a consideration of the relevant factors and whether the agency made a clear error of judgment." [30] The Supreme Court has said that "[courts] must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." [31] But "[w]hile this is a highly deferential standard of review, it is not a rubber stamp." [32] This court reviews the Board's reasoning with such discretion.

## B. The Denial of Reimbursement

As has already been pointed out, 42 C.F.R. § 413.30(e) provides exemptions for new SNFs that have "operated as the type of SNF (or the equivalent) for which it is certified for Medicare, under present and previous ownership for less than 3 full years." [33] With one member dissenting, the Board denied South Shore the reimbursement. Using the HCFA Pub 15-1 § 1500.7 [34] ("Provider Reimbursement Manual") for guidance, the Board found that South Shore's purchase of the DON rights from the defunct Prospect Hill was a "purchase of assets constituting a change in ownership ('CHOW')." [35] The Provider Reimbursement Manual defines "Other Disposition of Assets" as a type of Change in Ownership:

> Disposition of all or some portion of a provider's facility or assets (used to render patient care) through sale, scrapping, involuntary conversion, demolition or abandonment if the disposition affects licensure or certification of the provider entity.[36]

To further support its finding, the Board cited a letter from the Massachusetts De-

27. Adria Intern. Group, Inc. v. Ferre Development, Inc., 241 F.3d 103, 107 (1st Cir.2001).

28. 5 U.S.C. §§ 701–706.

29. 5 U.S.C. § 706(2)(A) and (E).

30. Airport Impact Relief, Inc. et al. v. Wykle, 192 F.3d 197, 202–3 (1st Cir.1999).

31. Thomas Jefferson University v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (internal quotations and citations omitted).

32. Airport Impact, 192 F.3d at 203.

33. 42 C.F.R. § 413.30(e).

34. HCFA Pub 15–1 is a section of the Provider Reimbursement Manual, which is released by the HCFA and is a set of interpretive rules regarding the Medicare statute and regulations. See Shalala v. Guernsey Memorial Hospital, 514 U.S. 87, 101–102, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995).

35. South Shore Hospital, 1999 WL 297452, at *16.

36. HCFA Pub 15–1 § 1500.7.

partment of Public Health that "clearly stated that there was both a change of ownership and a relocation...."[37] Upon determining that the transfer of intangible DON rights constituted a sale, the Board "looked back" into the operational history of Prospect Hill and determined that Prospect Hill had operated as the equivalent of a SNF during the previous three years. Consequently, the Board denied South Shore the reimbursements that it sought.[38]

This court must first determine whether the Board's decision that the transfer of DON rights constituted a change of ownership sufficient to trigger the "look back" into the operation of Prospect Hill was arbitrary and capricious. Only if there was a change of ownership need the court look into the prior operation of Prospect Hill to determine whether it operated as the equivalent of a SNF. If there was a change of ownership and the prior operation of Prospect Hill was the equivalent of a SNF, then the Board's decision must stand and the denial of the new provider exemption is proper.

## C. *Change of Ownership*

■ The Secretary, of course, agrees with the Board that there was a change in ownership and that South Shore had been operating during the previous three years under different ownership, as Prospect Hill. The Secretary maintains that there need not be a high degree of operational continuity between Prospect Hill and South Shore in order for the operation of the Prospect Hill to be imputed to South Shore.

The Secretary relies heavily on the Seventh Circuit's discussion of change of ownership in *Paragon Health Network, Inc. v. Thompson.*[39] *Paragon* affirmed the District of Wisconsin's affirmation of the Board's denial of a new provider exemption for a SNF which opened after purchasing the Certificate of Need ("CON")[40] rights for a number of beds from another SNF in the same Health Service Area. To bolster his argument, the Secretary points to language in *Paragon* that suggests a facility would continue to be the same provider even if it were to replace its entire staff and equipment.[41]

The connection between the two facilities in *Paragon*, however, distinguishes it from the instant case. Paragon opened a new SNF by purchasing the CON rights from another SNF which Paragon also owned and operated.[42] The court deemed this a simple transfer of beds between facilities run by the same administration. This is simply not the case here, where South Shore opened after the DON rights to 40 Beds were purchased from the receiver of the defunct Prospect Hill. The sole connection between Prospect Hill and South Shore was the intangible DON rights. South Shore did not acquire any building, land, patients, staff or equipment from Prospect Hill.[43] As the dissenting member of the Board said,

> [t]he DON rights .... [were] at best an intangible asset because it only evidenced the "right to create and operate nursing beds." The DON rights had

37. *South Shore,* at *16.

38. *Id.* at *17.

39. *Paragon Health Network, Inc. v. Thompson,* 251 F.3d 1141 (7th Cir.2001).

40. A CON is essentially identical to the Massachusetts DON.

41. *Paragon,* at 1148.

42. *Id.* at 1144.

43. *South Shore Hospital,* 1999 WL 29742, at *1.

some residual value only because the State had instituted a cap on the number of beds that could be licensed within the state....[Prospect Hill] was like a "totaled vehicle" with some parts being sold from the carcass. Thus, the receiver was merely selling available assets to generate funds to pay creditors. Hence, the sale of the intangible DON rights in 1994 did not affect the licensure and certification of Prospect Hill within the meaning of section 1500.7 since licensure and certification was lost due to other reasons.[44]

Accordingly, the Board erroneously denied South Shore a new provider exemption solely on the basis of the transfer of DON rights.

Another distinction between the decision in *Paragon* and the current case is the Seventh Circuit's public policy rationale. At least a part of the Seventh Circuit's rationale in *Paragon* was that there was nothing gained by transferring bed rights, that is, the same number of beds overall were being offered to the same population.[45] This argument is inapposite where, as here, the bed rights at issue were purchased from a non-operational facility (Prospect Hill), and there was an overall gain to society in the form of added health care beds to the area.

Again, there was simply no transaction from which there could have been a reasonable finding of a change of ownership. Prospect Hill and South Shore were two distinct facilities. They had nothing to do with one another except for the purchase of DON rights. South Shore was required by Massachusetts to acquire a DON in order to begin operation of a SNF. Due to the strict limit on the numbers of health care beds in Massachusetts, the only way to acquire a DON was to purchase the rights from another facility. Because the record does not evidence any relationship between South Shore and Prospect Hill beyond a simple transfer of DON bed rights, there can not have been a change of ownership. The Board's decision to the contrary was arbitrary and capricious.

Furthermore, the Board supported its decision that there was a change in ownership with the March 22, 1994 letter from the Massachusetts Department of Public Health which said: "[t]he primary reason given for the transfer of site is that the Division of Health Care Quality approved the transfer of ownership of Prospect Hill Manor to South Shore Hospital, assuming relocation of the long-term facility to the campus of South Shore Hospital."[46] But that letter does not accurately reflect the facts of this case. There was no relocation of Prospect Hill to South Shore Hospital because Prospect Hill was defunct. Both Parties agree that the only relationship between the two facilities was the transfer of DON rights. As the dissenting Board member pointed out: "the 'assumption' of a relocation of that facility was not supported by the facts because Prospect Hill was defunct and nothing else was purchased....The language of the letter appears to be 'boiler-plate' and simply d[oes] not fit the facts of this case."[47] Because of the inaccuracies in this letter, the Board's reliance on it in its findings was misplaced.

Were this court to find there had been a change of ownership, the next step of the inquiry would be to determine whether Prospect Hill acted as the equivalent of a SNF. However, the court does not reach

**44.** *Id.* at *19.

**45.** *Paragon,* 251 F.3d at 1150.

**46.** A.R. at 553; *South Shore,* at *16.

**47.** *South Shore,* at *20.

that level of inquiry, finding that there was, as a matter of law, no change of ownership.

### CONCLUSION

The Secretary's finding that South Shore's purchase of intangible DON rights once owned by Prospect Hill constituted a change of ownership, thus triggering an inquiry into the operational history of Prospect Hill and leading to the denial of new provider exemption, was clearly not in accordance with the law. Since there was not a change of ownership, the inquiry into Prospect Hill's operational history was unwarranted. Therefore, the motion for Summary Judgment by the Defendant is DENIED and South Shore's Motion for summary judgment is ALLOWED. The case shall be remanded to the Provider Reimbursement Review Board for a determination of the reimbursements owed to South Shore consistent with this opinion.

AN ORDER WILL ISSUE