# United States Court of Appeals

## For the First Circuit

No. 02-1284

SOUTH SHORE HOSPITAL, INC., D/B/A SOUTH SHORE HOSPITAL
TRANSITIONAL CARE CENTER,

Petitioner, Appellee,

v.

TOMMY G. THOMPSON, SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Selya, Lynch and Lipez,

Circuit Judges.

Anthony A. Yang, Attorney, Appellate Staff, Civil Division, United States Department of Justice, with whom Michael J. Sullivan, United States Attorney, Robert D. McCallum, Jr., Assistant Attorney General, and Barbara C. Biddle, Attorney, Appellate Staff, were on brief, for appellant.
Donald R. Frederico, with whom Peter R. Leone and McDermott, Will & Emery were on brief, for appellee.

October 16, 2002

**SELYA**, **Circuit Judge**.  This appeal leads us into the often surreal world of Medicare administration.  It arises out of efforts by South Shore Hospital (the Hospital), an acute care hospital located in South Weymouth, Massachusetts, to obtain relief for its transitional care center (the TCC) from Medicare's cost limits on reimbursement of routine patient care expenses.  The Health Care Financing Administration (HCFA) denied the Hospital's application on the ground that its purchase of determination of need (DON) rights from an unaffiliated nursing home rendered unavailable the so-called "new provider" exemption codified at 42 C.F.R. § 413.30(e)(2) (1994).[1]  The Provider Reimbursement Review Board (the Board) of the United States Department of Health and Human Services (HHS) affirmed this determination.  See S. Shore Hosp., No. 99-D38, 1999 WL 297452 (PRRB Apr. 21, 1999) (S. Shore I).  The federal district court, however, took a different view, reversing the Board's decision.  S. Shore Hosp. v. Thompson, 204 F. Supp. 2d 76, 83 (D. Mass. 2002) (S. Shore II).  This timely appeal ensued.

We conclude that the new provider exemption is less than pellucid; that the Secretary's interpretation of the relevant

_____

[1]Although the new provider exemption lately has migrated, after certain amendments not relevant here, to 42 C.F.R. § 413.30(d) (2000), the previous version of the rule was in effect at all times material hereto, and we will continue to refer to that version.  By like token, even though HCFA is now known as the Centers for Medicare and Medicaid Services, we will continue to use the original acronym.

regulatory language is reasonable (although not inevitable); that the Hospital has failed to show that the Secretary vacillated in his interpretation; and that substantial evidence supports the Board's finding that the now-defunct nursing home from which the Hospital acquired the necessary DON rights operated as an equivalent of the TCC. Consequently, we sustain the Secretary's refusal to classify the TCC as a new provider, reverse the decision of the district court, and direct the entry of judgment in favor of the Secretary.

## I.  STATUTORY AND REGULATORY FRAMEWORK

The Medicare Act, 42 U.S.C. §§ 1395-1395ggg, provides federal funding for a range of medical services for the elderly and disabled, including reimbursement for the reasonable cost of certain services provided by skilled nursing facilities (SNFs). Id. § 1395f(b)(1); 42 C.F.R. § 413.1(a)(2)(ii), (b), (g).  The Act expressly vests in the Secretary of HHS the discretion to determine reasonable costs by regulations that, inter alia, "may provide for the establishment of limits on the [costs] to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services."  42 U.S.C. § 1395x(v)(1)(A).  In this regard, the Act mandates routine cost limits (RCLs) that restrict per diem reimbursement to 112% of the

national average for similarly situated providers.[2] Id. §
1395yy(a). Exemptions and exceptions that permit higher rates of
reimbursement are allowed "to the extent the Secretary deems
appropriate, based upon case mix or circumstances beyond the
control of the facility." Id. § 1395yy(c).

At issue here is an exemption for "new providers" of
skilled nursing services. 42 C.F.R. § 413.30(e)(2). The Secretary
promulgated this exemptive regulation in 1979 to ameliorate the
"initial underutilization" faced by many market entrants. 44 Fed.
Reg. 31,802. It authorizes an exemption when "[t]he provider of
inpatient services has operated as the type of provider (or the
equivalent) for which it is certified for Medicare, under present
and previous ownership, for less than three full years." 42 C.F.R.
§ 413.30(e)(2). This, then, permits the Secretary, under some
circumstances, to deny the exemption by tying together present and
previous ownership.

Although this phraseology makes previous ownership an
important datum, the regulation does not dictate how previous
ownership determinations should be made. The Secretary has
interpreted this phrase, more majorum, by reference to Part I of
HCFA's Provider Reimbursement Manual (the Manual). Pertinently,

---

[2]Routine service costs include those costs, such as room and
board, basic medical supplies, ordinary dietary and nursing
services, and other quotidian expenses, for which an institution
typically would assess a single per diem service charge. 42 C.F.R.
§ 413.53(b).

the Manual has long defined "change of ownership" as including the sale of "all or some portion of a provider's facility or assets (used to render patient care)," so long as such sale "affects licensure or certification of the provider entity." PRM-1 § 1500.7 (1976). The Manual eventually integrated change of ownership, so defined, into determinations of previous ownership and, ultimately, into the definition of new provider. See id. § 2533.1.E.1.b (1997). It warns, however, that "[t]he mere existence of a [change of ownership] does not in itself make an institution or institutional complex eligible for a new provider exemption." Id. § 2533.1.E. Rather, the Secretary conducts a comparison of the operations conducted by the previous and current owners in order to decide whether the current owner qualifies. Equivalency plays an important role in this comparison, for, generally speaking, previous ownership will not be carried forward unless, at a bare minimum, the previous owner's operations and the current owner's operations are deemed equivalent.

## II. PROCEDURAL BACKGROUND

The Hospital began to plan for the TCC in 1992, with an eye toward supplementing its existing continuum of care. But there was a rub: Massachusetts, like many states, titrates the provision of health care by requiring various types of facilities to secure determinations of need as a prerequisite to offering covered

services.[3]  See Mass. Gen. Laws ch. 111, § 25C; Mass. Regs. Code tit. 105, § 100.352.  Because Massachusetts had placed a moratorium on the issuance of DON rights for skilled nursing beds, the Hospital's plans were stymied until it arranged to purchase the necessary DON rights from Prospect Hill Manor Nursing Home (Prospect Hill), a facility that had gone into receivership in March 1993.  No other transfers of property, patient records, or assets accompanied the purchase, and the entity known as Prospect Hill vanished shortly after transferring the DON rights.

The Commonwealth of Massachusetts approved the transfer of DON rights on condition that the Hospital assume liability for any and all Medicaid overpayments to Prospect Hill.  Subsequently, it approved a phantom "relocation" of Prospect Hill to the Hospital's campus.  Armed with these approvals, the TCC opened its doors in January of 1995.

On May 17, 1995, the Hospital petitioned HCFA to classify its nascent TCC as a new provider.  The Hospital's continuing interest in the exemption is easily grasped:  in 1995 — its first full year of operation — the TCC's routine service costs exceeded the applicable RCLs by almost $900,000.  And when Congress replaced Medicare's existing cost-based reimbursement system with a

_____

[3]What Massachusetts calls determination of need rights are known elsewhere as certificate of need (CON) rights.  See, e.g., R.I. Gen. Laws § 23-15-1 to -10 (2001).  We use the two terms interchangeably.

prospective payment system that looked to a facility's 1995 reimbursement levels as a basis for setting future rates, see Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4432(a), 111 Stat. 251, 422 (codified as amended at 42 U.S.C. § 1395yy(e)(3)(A)(ii)), the lure of the new provider exemption became irresistible.

In due course, HCFA rejected the Hospital's application on the ground that the conveyance of DON rights required that Prospect Hill's previous operations be imputed to the TCC. Following an evidentiary hearing, the Board affirmed this determination. S. Shore I, supra, at *18. In so holding, the Board found that, in the circumstances of this case, the transferred DON rights were a sufficient basis for imputation of previous ownership to the purchaser and that Prospect Hill and the TCC were equivalent providers. Id. at *16-*17. In regard to equivalency the Board acknowledged that Prospect Hill had not furnished the same level of nursing care that characterized the operations of the TCC, but nonetheless concluded that Prospect Hill had been operating as an SNF during the three years prior to the conveyance. Id. at *17. The Secretary declined to intervene, thus making the Board's decision administratively final. 42 U.S.C. § 1395oo(f)(1).

The Hospital petitioned for judicial review. See id. The district court reversed, declaring that the TCC was a new

provider in every relevant sense and that the Board could not reasonably have ruled otherwise. S. Shore II, 204 F. Supp. 2d at 82. Accordingly, the court remanded the matter to the Board for a determination of what level of reimbursement the TCC, as a new provider, should receive. Id. at 83. This appeal followed.

## III. STANDARD OF REVIEW

An inquiring court can set aside an agency's adjudicatory decisions only if those decisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "unsupported by substantial evidence in the administrative record," id. § 706(2)(E). This standard tightly circumscribes judicial review. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971); Henry v. INS, 74 F.3d 1, 4 (1st Cir. 1996).

Here, there is a further gloss on this familiar formulation. Where Congress has entrusted rulemaking and administrative authority to an agency, courts normally accord the agency particular deference in respect to the interpretation of regulations promulgated under that authority. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945); Johnson v. Watts Regulator Co., 63 F.3d 1129, 1134-35 (1st Cir. 1995). Courts withhold such deference only when the agency's interpretation of its regulation is "plainly erroneous or inconsistent with" its language. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512

(1994). This deference is at its apex when, as in this instance, a regulation concerns "a complex and highly technical regulatory program in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." Id. (citation and internal quotation marks omitted).

Both the district court and the court of appeals are bound by these principles. Therefore, we review the district court's resolution of such a case de novo, applying essentially the same standards as pertained in that court. Assoc. Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997); Mass. DPW v. Sec'y of Agric., 984 F.2d 514, 520 (1st Cir. 1993). That the parties brought the issues forward on cross-motions for summary judgment is not significant; substance must prevail over form, and the fact remains that the parties have presented this matter as a case stated, on a fully developed administrative record. Our review proceeds accordingly.

## IV. ANALYSIS

We turn now to the Secretary's construction and application of the new provider exemption, 42 C.F.R. § 413.30(e)(2). Our analysis proceeds in three steps. First, we discuss the reasonableness of the Secretary's interpretation of the exemption. Second, we address the Hospital's related claim that the Secretary has applied the regulation willy-nilly. Finally, we

scrutinize the Board's finding that Prospect Hill and the TCC were equivalent providers.

## A. Interpretation of the Exemption.

Despite the fact that Medicare rules fall squarely within the Secretary's domain, deference is due to the Secretary's interpretation of a particular regulation only when the language of the regulation either (1) compels that interpretation or (2) admits of differing interpretations, and the Secretary chooses reasonably among them. Christensen v. Harris County, 529 U.S. 576, 588 (2000); Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). Here, the Hospital's main argument is that the new provider exemption is unambiguous and demands an interpretation at odds with the Secretary's rendition.

We find the new provider provision vague (and, therefore, manifestly ambiguous). This case hinges on the meaning of the phrase "previous ownership," and section 413.30(e)(2) neither defines nor explains that phrase. To complicate matters, the terms "provider" and "institution" are central to an understanding of the exemption, and those terms subsume any number of components, changes in one or all of which might, depending on the context, lead one to deduce that a new provider has (or has not) been created. Because the regulation is not drawn in blacks and whites but leaves significant gray areas unresolved, it is ambiguous. See Paragon Health Network, Inc. v. Thompson, 251 F.3d 1141, 1148 (7th

-10-

Cir. 2001) (discussing the same regulation and reaching the same conclusion).

To state the obvious, the fact that the regulation is ambiguous means that some interpretation is inevitable. The question reduces, therefore, to whether using the transfer of DON rights as a basis for ascribing Prospect Hill's operations to the Hospital comes within a reasonable interpretation of the regulation. We think that this question must be answered in the affirmative.

In this case, the Secretary relied on section 1500.7 of the Manual for guidance. Noting that Prospect Hill's DON rights were virtually the only assets it owned at the time of the transfer, he determined that the sale of the rights qualified as a purchase of assets affecting licensure or certification (and, therefore, constituted a change of ownership). S. Shore I, supra, at *13. In this connection, the Secretary explained that there need not be a high degree of operational continuity between providers in order for the operation of one to be imputed to the other. Following this train of thought and citing section 2604.1 of the Manual, the Secretary determined that the relocation of beds from Prospect Hill to the TCC did not substantially change the population served or the number of inpatient days accumulated. Id. at *15. Concomitantly, the Secretary "looked back" at Prospect Hill's operational history and determined that it had functioned as

the equivalent of an SNF during the previous three years because it had furnished some skilled nursing rehabilitation services, as identified in 42 C.F.R. § 409.33(b) and (c). S. Shore I, supra, at *14. Accordingly, he denied the Hospital's application for a new provider exemption.

The Hospital, ably represented, attempts to discredit the Secretary's reasoning in several different ways. First, it emphasizes the genesis of the change of ownership definition contained in PRM-1 § 1500.7 (which originally addressed the obligations of facilities leaving the Medicare program) and argues that the Secretary arbitrarily applied this definition to the new provider exemption. But the Secretary, through HCFA, historically has defined change of ownership differently in different contexts,[4] and we see no reason why the Secretary, in the exercise of his broad authority to interpret regulations that he himself has promulgated, cannot choose to apply section 1500.7's dilucidation in this context, regardless of the provision's origins.

The Hospital also argues that a transfer of DON rights alone cannot constitute a continuation of ownership for purposes of this case because Prospect Hill closed its doors for unrelated

_____

[4]To cite one example, HCFA has regarded a transfer of corporate stock as a change of ownership for some purposes but not for others. See Las Encinas Hosp., No. 95-0303, 1998 WL 611452 (PRRB Sept. 11, 1998). To cite another, HCFA defines changes of ownership for Medicare certification purposes differently than for Medicare payment purposes. See N. Fla. Physical Therapy Serv., No. 98-D10, 1998 WL 119693 (HCFA Feb. 3, 1998).

reasons (and, thus, the transfer did not contribute to the loss of its licensure and certification). The district court found merit in this argument, see S. Shore II, 204 F. Supp. 2d at 81-82, but we do not. Fairly read, section 1500.7 requires only that the transfer "affect" licensure or certification, not that it be the dispositive factor. Here, the DON rights were a sine qua non for the operation of a nursing home (whether Prospect Hill or the TCC) — and the handsome price that the Hospital paid for them (which appears to have been in the range of $125,000 - $150,000) attests to their materiality. We cannot say that the Secretary acted unreasonably in rejecting the conceit that the significance of DON rights should be measured solely by the happenstance of when the original owner of the rights went out of business.

In a related vein, we question the emphasis placed by the lower court on the fact that Prospect Hill's DON rights were out of circulation at the time of the purchase. See id. at 82. The court's implication is that Medicare ought to spend more reimbursement dollars for routine service costs because the Hospital has "rescued" these dormant beds from the scrap heap. Id. Even if we credit the district court's characterization of the Hospital as a rescuer, however, that would not impugn the Secretary's discretionary decision to treat all purchasers of DON rights alike. See Arkansas v. Oklahoma, 503 U.S. 91, 113-14 (1992) (affirming that, within wide limits, agencies may decide for

-13-

themselves what factors pertain to their decisionmaking).  The Secretary's vision of the transfer as simply relocating the beds in question is not impermissible.

This reasoning also defeats the Hospital's "fragmentation" argument, in which it points out that a previous owner may sell its DON rights to one party, its site to a second party, and a third pivotal asset (say, its equipment) to yet another party.  According to the Hospital, this threatens to create a situation where one previous owner can spawn a multitude of successors, none of whom will be regarded as a new provider.

Unlike the Hospital, we find this result to be acceptable.  After all, we would not hesitate to use the term "previous ownership" in reference to three 100-bed hospitals resulting from the split of a single 300-bed facility.  Cf. Md. Gen. Hosp., Inc. v. Thompson, 155 F. Supp. 2d 459, 462-65 (D. Md. 2001) (finding that "previous ownership" precluded a new provider exemption when a nascent facility bought CON rights from three different institutions).  Consequently, the fragmentation argument fails.

The Hospital next asserts that its actions were guided by the plain meaning of the regulation and that "[a]ny contrary interpretation of the regulation would require a gross distortion of the English language."  Appellee's Br. at 38.  This approach is doubly flawed.  In the first place, it overlooks the patent

ambiguity of the regulation. In the second place, accepting it would make a mockery of the deference due to the Secretary's interpretation of his own regulations. As the Hospital itself acknowledges, change of ownership is a term of art in the Medicare context. As such, interpretation of the term lies peculiarly within the compass of the Secretary's expertise. See Thomas Jefferson, 512 U.S. at 512; Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991).

In a variation on this theme, the Hospital maintains that the Secretary's interpretation of the new provider exemption oppugns the underlying policy of the exemption when applied to states, such as Massachusetts, that have imposed moratoria on new nursing home beds. As the Seventh Circuit explained, however, moratoria on DON rights effectively limit the number of permitted beds and thus reduce competition among such facilities. Paragon, 251 F.3d at 1150. This means that any given facility in a moratorium state will be less likely to experience and sustain a high vacancy rate during its early years. Consequently, new or expanded facilities in moratorium states have less need for special swaddling to prevent the financial drain of initial underutilization. See id.

The district court attempted to distinguish Paragon as a change of ownership between related corporations. S. Shore II, 204 F. Supp. 2d at 81. But the court never explained how this

-15-

circumstance compromised the underlying policy of the new provider exemption. Insofar as we can discern, relationship through a common corporate parent will have little effect on whether the transfer of DON rights does (or does not) ameliorate a facility's initial underutilization. Once that is understood, there is no principled reason why the facility discussed in <u>Paragon</u> should have any diminished claim to improved reimbursement by virtue of being a related subsidiary.[5]

In a further endeavor to blunt the force of <u>Paragon</u>, the Hospital notes that the language of the regulation at issue does not distinguish between facilities in states with and without moratoria. For this reason, it muses, the Secretary's interpretation inevitably will lead to non-uniformity. Relatedly,

---

[5]The Hospital has called to our attention through successive post-argument letters, <u>see</u> Fed. R. App. P. 28(j); 1st Cir. R. 28(j), the recent decisions in <u>Mercy Med. SNF</u> v. <u>Mut. of Omaha Ins. Co.</u>, No. 97-0135, 2002 WL 1906219 (PRRB Aug. 7, 2002), and <u>Peninsula Reg'l Med. Ctr.</u> v. <u>BCBS Assoc.</u>, No. 97-2659, 2002 WL ___ (PRRB Sept. 27, 2002). In both instances the Board, relying in large part on the district court's opinion in this case, rejected the Secretary's interpretation of the new provider exemption. <u>Mercy Med.</u>, <u>supra</u>, at *17; <u>Peninsula Reg'l</u>, <u>supra</u>, at *__. As the dissent in <u>Mercy Med.</u> observed, however, six PRRB decisions, eight reported HCFA determinations, five district court opinions, and a court of appeals opinion (<u>Paragon</u>) all have upheld the Secretary's interpretation of the new provider exemption. <u>Mercy Med.</u>, <u>supra</u>, at *19 (dissenting op.). Moreover, the Board recently granted the Secretary's motion to reconsider <u>Mercy Med.</u>, and that reconsideration is presently underway. (The time for reconsideration has not yet run in <u>Peninsula</u>.) Given this mise-en-scène, we regard these decisions as founded upon a mistaken legal interpretation and, therefore, entitled to little weight. <u>See</u> <u>Good Samaritan Hosp.</u> v. <u>Shalala</u>, 508 U.S. 402, 417 (1993).

it suggests that the Secretary ought to bear the burden of adducing sufficient evidence or analysis to show that the putative oligopoly effect in moratorium states will help relieve initial costs.

In asserting these propositions, the Hospital leans heavily on the decision in Ashtabula County Med. Ctr. v. Thompson, 191 F. Supp. 2d 884, 895-96 (N.D. Ohio 2002). We think that Ashtabula — a case that is currently on appeal to the Sixth Circuit — erects the wrong decisional framework. The court's opinion appears to place the burden on the Secretary to show that his interpretation of a regulation is reasonable. See id. That is not the law. The burden is on the party challenging the Secretary's reasoning to show that it fails to pass muster under the reasonableness standard. See Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 60 (1st Cir. 2001); St. Mary of Nazareth Hosp. Ctr. v. Schweiker, 718 F.2d 459, 466 (D.C. Cir. 1983). Hence, it is the Hospital that must show that the Secretary unreasonably relied on the oligopoly effect theory. The Hospital has not done so (and, indeed, there is evidence in the record suggesting that the TCC did in fact enjoy a relatively high level of patient utilization from the start).

As to the charge of non-uniformity, it suffices to say that discretion, such as that specifically conferred upon the Secretary to establish limits on routine care costs, almost invariably involves line-drawing (and, thus, inevitably entails

-17-

some level of variation). See Sprandel v. Sec'y of HHS, 838 F.2d 23, 27 (1st Cir. 1988) (per curiam) (observing that it is impossible to block out administrative categories that do not "chafe at the outer edges"). We need find only that, from some plausible standpoint, the Secretary had an organizing primum mobile sufficient to justify his actions. The Secretary's proffered oligopoly effect theory passes this test.

The Hospital's rejoinder is that the Secretary's interpretation of section 1500.7 effectively obviates new provider status for many (or even all) "new" SNFs within Massachusetts. Even if true, this lament does not call the Secretary's judgment into serious question. The goal of regulation is not to provide exact uniformity of treatment, but, rather, to provide uniformity of rules so that those similarly situated will be treated alike. In addition, as the Seventh Circuit suggested, the Secretary reasonably may have concluded that, in states that have imposed moratoria because they no longer need additional nursing beds, subsidizing the start-up costs of new SNFs is unnecessary for the efficient delivery of health-care services. Paragon, 251 F.3d at 1149.

To sum up, we find no plausible reason to discredit the Secretary's rationale that, when one facility purchases another's DON rights in a moratorium state, lessened competition will enhance initial utilization (and, thus, will help defray costs in the

-18-

transferee facility's early years).  On that rationale, it makes sense, for purposes of construing the new provider exemption, to attribute the operations of the seller to the acquirer of the DON rights.  After all, "[w]hen Congress entrusts an agency with the responsibility for drawing lines, and the agency exercises that authority in a reasonable way, neither the fact that there are other possible places at which the line could be drawn nor the fact that the administrative scheme might occasionally operate unfairly from a particular participant's perspective is sufficient, standing alone, to undermine the scheme's legality." Mass. DPW, 984 F.2d at 522.  We therefore follow Paragon and uphold the Secretary's interpretation of the disputed regulation as against the Hospital's "reasonableness" challenge.

## B. **Consistency**.

The Hospital has a fallback position:  even if the Secretary's interpretation of the new provider exemption is not arbitrary and capricious, its thesis runs, his interpretation flouts prior practice.  The theoretical foundation on which this position rests is sound:  if, over time, an agency interprets a regulation erratically, that inconsistency may warrant a court in declining to defer to the agency in a particular situation. See Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417 (1993); INS v. Cardoza-Fonseca, 480 U.S. 421, 446 n.30 (1987).  In this case, however, the Hospital's thesis fails.

Once proffered, agency interpretations are not chiseled in stone.  See  Good Samaritan Hosp., 508 U.S. at 417 ("An administrative agency is not disqualified from changing its mind.") (citation omitted).  As we have pointed out, "[e]xperience is often the best teacher, and agencies retain a substantial measure of freedom to refine, reformulate, and even reverse their precedents in the light of new insights and changed circumstances." Davila-Bardales v. INS, 27 F.3d 1, 5 (1st Cir. 1994).

This does not mean that an agency may change positions with the same ease that an actor changes costumes.  For example, an agency may not, without rhyme or reason, create conflicting lines of precedent governing materially identical situations.  Shaw's Supermarkets, Inc. v. NLRB, 884 F.2d 34, 36-37 (1st Cir. 1989).  But an agency may learn from its mistakes and decide to discard one interpretation in favor of another, as long as it thereafter consistently applies the new interpretation.  See, e.g., Rust v. Sullivan, 500 U.S. 173, 186-87 (1991); Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 42 (1983).

The Hospital complains that the Secretary has only sporadically denied new provider exemptions to facilities that have acquired DON rights from other providers.  To support this plaint, the Hospital cites a single incident, involving a facility known as Meridian-Spa Creek, in which HCFA granted a new provider exemption despite the facility's use of transferred CON rights.  This

citation is unpersuasive.  The incident occurred well before the TCC applied for its exemption, and it is impossible to tell from the scanty record why HCFA granted Meridian-Spa Creek an exemption.

It is incumbent on a party complaining of inconsistency in administrative action "to bring before the reviewing court sufficient particulars of how the appellant was situated, how the allegedly favored party was situated, and how such similarities as may exist dictate similar treatment and how such dissimilarities as may exist are irrelevant or outweighed."  P.I.A. Mich. City, Inc. v. Thompson, 292 F.3d 820, 826 (D.C. Cir. 2002).  While the Hospital speculates that the unexplained grant of an exemption to Meridian-Spa Creek betrays a pervasive inconsistency in HCFA decisions, it has not supported this conjecture with proof.  Nor has the Hospital shown that its circumstances bear a substantial similarity to those of Meridian-Spa Creek in all (or nearly all) relevant aspects.  Hence, we cannot say that the Meridian-Spa Creek scenario demonstrates administrative inconsistency.[6]

---

[6]In all events, the Meridian-Spa Creek determination may be no more than a waif in the wilderness.  It was not appealed to the Board, much less to the HCFA Administrator or the Secretary.  Thus, the determination may well be explained as the decision of a lower-level agency employee that cannot bind either the Board or the Secretary.  See Irving v. United States, 162 F.3d 154, 166 (1st Cir. 1998) (en banc) ("To determine what is agency policy, courts customarily defer to the statements of the official policymaker, not others, even though the others may occupy important agency positions."); Henry, 74 F.3d at 5-6 (recognizing that in large, bureaucratic agencies, "different officials may not act identically in every case," but, nevertheless, "[a] certain amount of asymmetry is lawful") (citation and internal quotation marks omitted).

-21-

That ends this aspect of the matter. Because the Hospital has failed to show that the Secretary's interpretation of the new provider exemption constitutes a reversal of position, its argument fails. Although patently inconsistent applications of agency standards to similar situations are by definition arbitrary, the law does not demand perfect consistency in administrative decisionmaking. <u>See</u> <u>Ill. Bell Tel. Co.</u> v. <u>FCC</u>, 740 F.2d 465, 470-71 (7th Cir. 1984).

Along somewhat the same lines, the Hospital urges what amounts to an ex post facto theory. It asseverates that HHS published its new guideline, PRM-1 § 2533.1, in August of 1997, more than two years <u>after</u> the Hospital first submitted its application for new provider status. Thus, the Hospital asserts, the Secretary should not be able to change the rules by applying the new guideline retroactively. This is especially so, it maintains, because the prior guideline, PRM-1 § 2604.1, stated that "changes of the institution's ownership or geographic location do not in itself [sic] alter the type of health care furnished and shall not be considered in the determination of the length of operation."

This argument is unavailing. The Manual is merely an interpretive guide, and interpretive guides generally do not have the force of law. <u>See</u>, <u>e.g.</u>, <u>Arnold</u> v. <u>United Parcel Serv., Inc.</u>, 136 F.3d 854, 864 (1st Cir. 1998) (collecting cases). In any

-22-

event, the Board's decision in S. Shore I did not rely upon (and, indeed, never cited) PRM-1 § 2533.1.  Last — but far from least — even though the Manual did not specifically incorporate change of ownership into the definition of new provider until 1997, there is ample evidence that HCFA did apply the more limited concept of change of ownership involving DON rights to new provider determinations prior to 1995 (the time when the Hospital initially requested the exemption).  See Appellee's Br. at 43 (conceding that HCFA previously had denied new provider exemptions on the basis of transferred DON rights); see also Larkin Chase Nursing & Restorative Ctr. v. Shalala, No. 99-00214, 2001 U.S. Dist. LEXIS 23655 (D.D.C. Feb. 6, 2001).  Consequently, we see no basis for characterizing the 1997 implementation of PRM-1 § 2533.1 as a post hoc rationalization.

## C. **Equivalency**.

Previous ownership aside, an applicant is not disqualified from access to the new provider exemption unless it "has operated as the [same] type of provider (or the equivalent)" for the prescribed period.  42 C.F.R. § 413.30(e)(2).  In a last-ditch effort to ward off disqualification, the Hospital asks us to rule that the Board erred in finding that Prospect Hill had operated as the equivalent of an SNF (and, thus, as an equivalent of the TCC).  The district court did not reach this issue, and the

-23-

Secretary requests us to remand it to the lower court for specific findings.  The Hospital, however, urges us to decide it.

Although we sometimes decline to pass upon issues not first vetted by the district court, e.g., N.E. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 19 (1st Cir. 2002), that is by no means an inflexible rule.  Where, as here, we are called upon to view a static administrative record through the same prism as the lower court, deciding the case fully is often the option of choice. See, e.g., Trustees of Mich. Laborers' Health Care Fund v. Gibbons, 209 F.3d 587, 595 & n.5 (6th Cir. 2000) (collecting cases).  This is a paradigmatic case for the application of such a principle: the facts are straightforward and fully developed, and the parties have had notice of, and ample opportunity to respond to, the merits of the unaddressed issue.  We turn, then, to the Board's equivalency finding.

The Hospital's argument on this point amounts to an attack upon the sufficiency of the evidence.  This is an uphill climb, for courts ordinarily do not afford plenary review to administrative factfinding.  So it is here: our review is limited to whether the equivalency finding is supported by substantial evidence in the administrative record.  See 5 U.S.C. § 706(2)(E); see also 42 U.S.C. § 1395oo(f)(1) (conforming judicial review in Medicare matters to the standards set forth in section 706 of the APA).  So long as the Board reasonably could have credited those

-24-

witnesses and reports supporting its finding that Prospect Hill had operated as the equivalent of an SNF, we must sustain its equivalency finding. See Mass. DPW, 984 F.2d at 525-26; Concerned Citizens on I-190 v. Sec'y of Transp., 641 F.2d 1, 7 (1st Cir. 1981). It is immaterial how we, if sitting as a court of first instance, would have resolved the disputed questions of fact.

Generally speaking, substantial evidence comprises proof that a reasonable mind might find adequate, in light of the record as a whole, to support a particular conclusion. NLRB v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 21-22 (1st Cir. 1999). Such proof suffices even if the evidence also might support some other, inconsistent conclusion. Posadas de P.R. Assocs., Inc. v. NLRB, 243 F.3d 87, 90 (1st Cir. 2001). So viewed, "substantial evidence" is an objective standard that gives the agency the benefit of the doubt as to disputed facts. See Beverly Enters.-Mass., 174 F.3d at 21-22. This sets the bar fairly low.

In its original denial of the Hospital's application for an exemption, HCFA found that Prospect Hill had satisfied the definition of an SNF because it had furnished skilled nursing care and related services for qualified persons as set forth in 42 C.F.R. § 409.33(b) and (c). HCFA based this finding in part on services that Prospect Hill provided only sporadically (as documented in that facility's periodic activity reports) as well as on the testimony of various witnesses presented at the Board's

hearing.  The Hospital argues that the record contains conflicting evidence and that the witnesses favorable to the Hospital outnumbered those favorable to the Secretary.  These observations are true as far as they go — but neither goes very far.  Within wide limits, the weight and credibility of the evidence are for the Board to determine.  See Am. Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 523 (1981); Posadas, 243 F.3d at 90.  Here, the Board's finding is supported by substantial evidence in the record.  No more is exigible.

Taking a slightly different tack, the Hospital seizes on an undisputed fact:  that Prospect Hill typically furnished custodial services, performing more sophisticated services only rarely.  Extrapolating from this fact, it contends that Prospect Hill could not have operated as the equivalent of an SNF (which offers sophisticated nursing care as a staple).  This strikes us as an oversimplification.

To be sure, Prospect Hill, in its heyday, was a Medicaid-certified Level III nursing home that provided custodial care primarily to psychiatric patients — but it also periodically delivered skilled nursing, restorative care, and other therapeutic services.  The TCC has a different orientation:  it is a Level II nursing home providing mostly rehabilitative care (and,

occasionally, custodial care) to a wide variety of patients.[7] Based on these and other differences, the Hospital suggests three ways in which the Board may have embarrassed the substantial evidence standard. First, the Hospital asserts that because the new provider exemption makes no explicit allowance for facilities as disparate as Prospect Hill and the TCC, such facilities necessarily must lie outside the ambit of the equivalency rubric. Second, the Hospital contends that in order to be an equivalent of an SNF, a facility would have to meet the definition of an SNF — and Prospect Hill did not. Third, the Hospital posits that, given the underlying policy of the new provider exemption, Prospect Hill's sporadic deployment of skilled nursing services simply does not justify a finding of equivalency.

All three of these arguments miss the essential point. The Secretary, in his discretion, reasonably could have looked not

---

[7]These levels are part of a taxonomy developed by the Commonwealth with respect to its administration of the Medicaid program. The Commonwealth defines a Level III nursing home as a supportive nursing care facility "that provide[s] routine nursing services and periodic availability of skilled nursing, restorative and other therapeutic services, as indicated, in addition to the minimum, basic care and services required for patients whose condition is stabilized to the point that they need only supportive nursing care, supervision and observation." S. Shore II, 204 F. Supp. 2d at 78 n.12 (quoting Mass. Regs. Code tit. 105, § 151.020). It defines a Level II nursing home as a skilled nursing care facility "that provide[s] continuous skilled care and meaningful availability of restorative services and other therapeutic services in addition to the minimum, basic care and services required for patients who show potential for improvement or restoration to a stabilized condition or who have a deteriorating condition requiring skilled care." Id.

at the particular level of care provided by a nursing facility, but, rather, at a broader definition of equivalency. Although our review is geared to whether the Secretary's decision rests on substantial evidence, we must in the process defer to what the Secretary reasonably found to be relevant. To do otherwise would fetter the Secretary's discretion in an unwarranted manner. See Villa View Cmty. Hosp., Inc. v. Heckler, 728 F.2d 539, 543 (D.C. Cir. 1984); see also Mass. DPW, 984 F.2d at 527 (reiterating that the court cannot substitute its judgment for that of the agency).

The Board accepted this premise — and reasonably so. In the process, it cited specifically to the nursing home reform provisions of the Omnibus Budget Reconciliation Act of 1987 governing the certification of long-term care facilities under Medicare and Medicaid. See Omnibus Budget Reconciliation Act of 1987 (Revenue Reconciliation Act of 1987), Pub. L. No. 100-203, §§ 4211(a)(3) & (c), 4212(a) & (b), 4213(a), 4216, 101 Stat. 1330-182, -196, -204, -207, -212, -213, -220 (1987) (codified as amended at 42 U.S.C. § 1395r). These provisions indicate that both Medicare SNFs and Medicaid nursing facilities provide the same basic range of services. See S. Shore I, supra, at *14, *17 (explaining that these provisions require both Medicare SNFs and Medicaid nursing facilities to provide the range of services described in sections 1819(b)(4) and 1919(b)(4) of the Social Security Act). Thus, Prospect Hill, as a Medicaid facility, "would have already incurred

the start-up costs associated with the development of the capacity to furnish inpatient SNF services, by meeting the requirements for participation." Id. at *2.

This is a convincing argument. Faced with it, we decline to substitute our judgment for the Secretary's as to whether so broad-gauged a comparison contradicts the underlying purpose of either the challenged regulation or the enabling statute. In the last analysis, Medicare is a complex and highly technical regulatory scheme, and courts should be hesitant to second-guess the Secretary in such matters. See Thomas Jefferson, 512 U.S. at 512; Cheshire Hosp. v. N.H.-Vt. Hosp'n Serv., Inc., 689 F.2d 1112, 1117 (1st Cir. 1982); see also Villa View, 728 F.2d at 543 (explaining that a court cannot reverse the Secretary's decision in such a case when doing so would require displacement of the Secretary's policy). We therefore uphold the Board's finding of equivalency.

## V. CONCLUSION

We need go no further. Generic perceptions of reality are not the gold standard when administrative discretion is in play. Where Congress has chosen to cede substantial discretion to an agency, a reviewing court should scrutinize the administrative record with due regard for that discretion and weigh the reasonableness of the Secretary's action accordingly. Mass. DPW, 984 F.2d at 522. That respectful approach is especially

-29-

appropriate when the challenged action — here, the interpretation of the new provider exemption — plainly calls for a delicate balancing of a melange of factors within the scope of the Secretary's expertise.  Hewing to these precepts, we affirm the Board's denial of the Hospital's application for a new provider exemption, reverse the district court's contrary decision, and direct the entry of judgment in favor of the Secretary.

**Reversed and remanded for the entry of judgment**.