ST. ELIZABETH'S MEDICAL
CENTER OF BOSTON,
INC., Plaintiff,

v.

Tommy G. THOMPSON, in his official capacity as Secretary of the United States Department of Health and Human Services, Defendant.

Civil Action No. 03–0153 (RMU).

United States District Court,
District of Columbia.

March 11, 2004.

74

Robert D. Wick, Covington & Burling, Washington, DC, Gregg David Shapiro, Choate, Hall & Stewart, Boston, MA, for Plaintiff.

Paul Edwin Soeffing, U.S. Department of Health & Human Services, Office of the General Counsel, Baltimore, MD, Robert E. Leidenheimer, Jr., Charlotte A. Abel, United States Attorney's Office, Washington, DC, for Defendant.

*MEMORANDUM OPINION*

URBINA, District Judge.

GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This case comes before the court on the parties' motions for summary judgment. The plaintiff, St. Elizabeth's Medical Center of Boston, Inc. ("St.Elizabeth's"), is a charitable corporation that operates a non-profit hospital in Boston, Massachusetts. St. Elizabeth's seeks judicial review of a decision by the defendant, Tommy G. Thompson, Secretary of the Department of Health and Human Services ("the Secretary"), denying St. Elizabeth's a new provider exemption under 42 C.F.R. § 413.30(e). Because the Secretary has examined the relevant data and made a rational connection between the facts found and the choices made, the court grants the defendant's motion for summary judgment and denies the plaintiff's motion for summary judgment.[1]

## II. BACKGROUND

### A. Factual Background

#### 1. Statutory and Regulatory Framework

Title XVIII of the Social Security Act ("the Medicare statute") sets forth the federal health insurance program commonly known as Medicare. 42 U.S.C. §§ 1395 *et seq.* Medicare provides payment for covered services to aged and disabled persons. Pl.'s Mot. at 2; Def.'s Mot. at 2. Part A of the statute provides payment for certain inpatient hospital and post-hospital extended care services, including skilled nursing services. Def.'s Mot. at 2; *see generally* 42 U.S.C. §§ 1395–1395ggg. The Centers for Medicare and Medicaid Services ("CMS") administer Medicare under the authority of the Secretary.[2] Pl.'s Mot. at 2; Def.'s Mot. at 2. A facility or part of a facility that primarily furnishes either skilled nursing care and related services or rehabilitation services is known as a skilled nursing facility ("SNF"). *Id.;* 42 U.S.C. § 1395i–3(a). Under Medicare, an SNF is entitled to reimbursement of reasonable costs that it incurs in treating a Medicare patient. 42 U.S.C. § 1395x(v)(1)(A); Pl.'s Mot. at 3; Def.'s Mot. at 3. CMS effectuates this reasonable cost restriction through its implementation of routine cost limits ("RCLs"), which are caps on the amount of reimbursement that Medicare provides for certain medical supplies and services. 42 C.F.R. § 413.30; Pl.'s Mot. at 3; Def.'s Mot. at 3–4.

The regulations, however, allow for reimbursement above the RCLs in certain circumstances. Under 42 C.F.R. § 413.30:

> Exemptions from the limits imposed under this section may be granted to a new SNF[.] A new SNF is a provider of inpatient services that has operated as a SNF (or the equivalent) for which it is certified under Medicare, under present and previous ownership, for less than 3 full years."

42 C.F.R. § 413.30(e).[3] This exemption from RCLs, commonly known as the "new provider exemption," was created in 1979 to mitigate the business risks, such as low patient occupancy, that a new inpatient facility might face that would reduce the amount of reimbursement. Pl.'s Mot. at 3;

---

1. Because the court concludes that St. Elizabeth's was not entitled to a new provider exemption, the court does not reach the parties' arguments regarding which fiscal years the exemption covers.

2. CMS was formerly known as the Health Care Financing Administration.

3. The new provider exception is now codified at 42 C.F.R. § 413.30(d).

Def.'s Mot. at 6. In addition, even if a provider does not qualify as a new provider under the express terms of § 413.30(e), the Secretary may still grant an exemption from RCLs if the provider "relocates" and demonstrates that it serves a substantially different inpatient population at the new location. Def.'s Mot. ¶ 8; Provider Reimbursement Manual ("PRM") § 2604.1.[4] To demonstrate that a provider has relocated, the provider must show that in the new location (1) the provider serves a substantially different inpatient population, and (2) the total inpatient days at the new location were substantially less than at the old location for a comparable period [of at least three months]. *Id.*

## 2. The St. Elizabeth's–Friel Transaction

St. Elizabeth's is a general acute care hospital in Boston, Massachusetts. Administrative Record ("A.R.") at 67, 96. In the mid–1990's, St. Elizabeth's staff identified a clinical need for on-site skilled nursing and rehabilitative care. *Id.* at 1601–05. To address this need, St. Elizabeth's decided to open a SNF, which it called the Transitional Care Unit ("TCU"). *Id.* at 443, 502. Under Massachusetts law, construction of a SNF may not begin until the Massachusetts Department of Public Health ("DPH") issues a "determination of need" ("DON"). *Id.* at 406–09. At the time St. Elizabeth's wished to construct its SNF, the only mechanism for obtaining a new DON was by acquiring the operating rights of an existing long-term care facility. *Id.* at 1193, 1465–68. This method for obtaining a DON was known as the "transfer of operating rights" method. *Id.* at 1465–68. Accordingly, St. Elizabeth's identified Friel Nursing Home ("Friel"), a family-owned nursing home located in Quincy, Massachusetts, as an existing long-term care facility from which St. Elizabeth's might acquire operating rights and thereby obtain a DON. *Id.* at 469–71, 1066.

On February 28, 1996, St. Elizabeth's entered into an Asset Purchasing Agreement to purchase the operating rights to Friel's 29 beds. *Id.* at 422–35. The agreement defined the term "assets" to mean only bed operating rights, and did not cover the acquisition of any other of Friel's assets. *Id.* On July 24, 1996 the Massachusetts legislature enacted a new statute, Chapter 203 of the 1996 Acts and Resolves of Massachusetts ("Chapter 203"), which permitted hospitals to open new SNFs without acquiring the operating rights of pre-existing facilities. *Id.* at 418. On October 11, 1996, St. Elizabeth's formally requested a DON for its TCU. *Id.* at 730. On October 21, 1996, DPH issued a letter finding that St. Elizabeth's had satisfied the requirements of Chapter 203 and granted St. Elizabeth's a new DON to establish the TCU. *Id.* at 440, 2000–01.

On January 15, 1997, the plaintiff applied to CMS for a new provider exemption to the RCLs. *Id.* at 1878–81. On June 18, 1997, CMS denied the plaintiff's application. *Id.* at 1885–88. In explaining its decision, CMS stated that the TCU "was established due to the purchase and relocation of 29 long term care beds from [Friel]." *Id.* at 1887. CMS noted that Friel had received certification as a Medicaid nursing facility and that as a result, Friel was "considered an equivalent provider of skilled nursing or rehabilitative services." *Id.* CMS further found that Friel had operated as the equivalent of a SNF by virtue of having provided skilled nursing and rehabilitation services. *Id.* Finally, CMS determined that the reloca-

---

4. CMS publishes the PRM, which contains guidelines for interpreting Medicare regula- tions. Pl.'s Mot. at 3.

tion provision contained in PRM § 2604.1 did not entitle St. Elizabeth's to an exemption because the TCU's inpatient population was not substantially different from the population Friel served. *Id.*

Dissatisfied with this result, on December 17, 1997, the plaintiff appealed CMS's decision to the Provider Reimbursement Review Board ("PRRB"). *Id* at 63. The PRRB agreed with St. Elizabeth's interpretation of the new provider exemption, and on October 4, 2002, reversed CMS's decision. *Id* at 65–112. In doing so, the PRRB found that St. Elizabeth's "acquisition of bed rights in the instant case does not represent a change of ownership." *Id.* at 99. Because the TCU was not established through the mere change in ownership of an already existing provider, St. Elizabeth's was entitled to a new provider exemption. *Id.* Further, the PRRB determined that "[t]he TCU serves a distinguishably different population than that served by Friel." *Id.* at 100.

On December 4, 2002, the Secretary, acting through the CMS Administrator ("the Administrator"), reversed the PRRB, finding that St. Elizabeth's did not meet the criteria for the new provider exemption.[5] *Id.* at 1–14. In contrast to the PRRB's decision, the Secretary found that St. Elizabeth's established the TCU through a change in ownership because St. Elizabeth's purchased the operational rights to Friel's beds. *Id.* at 10. The Secretary further concluded that because a change in ownership occurred, there was no new service provided, and therefore, St. Elizabeth's was not a new provider. *Id.* at 11. The Secretary then determined that Friel provided skilled nursing and/or rehabilitative services for more than three years. *Id.* at 12. Accordingly, the Administrator concluded that, including the

TCU's previous ownership, St. Elizabeth's had operated an SNF for more than three full years. *Id.* Finally, the Secretary reasoned that St. Elizabeth's could not qualify for a new provider exemption as a relocated provider because it served a substantially similar inpatient population as Friel and that St. Elizabeth's did not demonstrate that the total inpatient days at the new location were substantially less than at the old location. *Id.* at 13–14.

### B. Procedural History

On January 30, 2003, St. Elizabeth's filed a complaint with this court seeking judicial review of the Secretary's decision pursuant to 42 U.S.C. § 1395oo(f)(1). On June 16, 2003, St. Elizabeth's filed its motion for summary judgment. On August 18, 2003, the Secretary followed with his own motion for summary judgment. The court now turns to the parties' motions for summary judgment.

### III. ANALYSIS

### A. Legal Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could

---

**5.** The Administrator's decision constitutes the final administrative decision of the Secretary.

A.R. 1.

establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene,* 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

### B. Legal Standard for APA Review

■ Pursuant to the Medicare statute, this court reviews the Secretary's decisions in accordance with the standard of review set forth in the APA. 42 U.S.C. § 1395oo(f)(1); *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Mem'l Hosp./ Adair County Health Ctr., Inc. v. Bowen,* 829 F.2d 111, 116 (D.C.Cir.1987). The APA requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in a case . . . otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(A), (E). The arbitrary-and-capricious standard and the substantial-evidence standard "require equivalent levels of scrutiny." [6] *Adair County,* 829 F.2d at 117. Under both standards, the scope of review is narrow and a court must not substitute its judgment for that of the agency. *Motor Veh. Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Gen. Teamsters Local Union No. 174 v. Nat'l Labor Relations Bd.,* 723 F.2d 966, 971 (D.C.Cir.1983). As long as an agency has "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made," courts will not disturb the agency's action. *MD Pharm., Inc. v. Drug Enforcement Admin.,* 133 F.3d 8, 16 (D.C.Cir. 1998). The burden of showing that the agency action violates the APA standards falls on the provider. *Diplomat Lakewood*

---

**6.** The D.C. Circuit has explained that the substantial-evidence standard is a subset of the arbitrary and capricious standard. *Sithe/Indep. Power Partners v. Fed. Energy Regulatory Comm'n,* 285 F.3d 1, 5 n. 2 (D.C.Cir.2002). "While the substantial evidence test concerns

support in the record for the agency action under review, the arbitrary and capricious standard is a broader test subsuming the substantial evidence test but also encompassing adherence to agency precedent." *Adair County,* 829 F.2d at 117.

*Inc. v. Harris,* 613 F.2d 1009, 1018 (D.C.Cir.1979); *St. Joseph's Hosp. (Marshfield, Wis.) v. Bowen,* 1988 WL 235541, at *3 (D.D.C. April 15, 1988).

■ In reviewing an agency's interpretation of its regulations, the court must afford the agency substantial deference, giving the agency's interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation."[7] *Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. 2381 (internal quotations omitted); *Presbyterian Med. Ctr. of Univ. of Pa. Health Sys. v. Shalala,* 170 F.3d 1146, 1150 (D.C.Cir.1999); *see also Qwest Corp. v. Fed. Communications Comm'n,* 252 F.3d 462, 467 (D.C.Cir.2001) (stating that the court would reverse an agency's reading of its regulations only in cases of a clear misinterpretation). "So long as an agency's interpretation of ambiguous regulatory language is reasonable, it should be given effect." *Wyo. Outdoor Council v. United States Forest Service,* 165 F.3d 43, 52 (D.C.Cir.1999). Where the regulations involve a complex, highly technical regulatory program such as Medicare, broad deference is "all the more warranted." *Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. 2381 (internal quotations omitted); *Presbyterian Med. Ctr.,* 170 F.3d at 1151. As for interpretive guides, they are without the force of law but nonetheless are entitled to some weight. *Furlong v. Shalala,* 156 F.3d 384, 393 (2d Cir.1998).

## C. The Court Grants the Secretary's Motion for Summary Judgment and Denies St. Elizabeth's Motion for Summary Judgment

### 1. The Parties' Arguments

In its challenge to the Secretary's decision, St. Elizabeth's makes three main arguments. First, it contends that the defendant erred by concluding that St. Elizabeth's purchased Friel's bed operating rights, making Friel the previous owner of the TCU. Pl.'s Mot. at 19–24. Specifically, St. Elizabeth's states that Friel could not be considered the previous owner of the TCU because Friel never transferred its DON to St. Elizabeth's and that DPH granted St. Elizabeth's DON pursuant to Chapter 203. *Id.* at 19–20. Because the TCU did not have a previous owner, St. Elizabeth's asserts, the Secretary erred in finding that a new provider exemption was not warranted. *Id.* at 24. Second, St. Elizabeth's argues that even if the court concludes that Friel was the previous owner of the TCU, the Secretary should have granted St. Elizabeth's a new provider exemption because Friel did not operate as the equivalent of a SNF. *Id.* at 31–36. Rather, St. Elizabeth's maintains that Friel primarily provided custodial care, not skilled nursing or rehabilitative services. *Id.* Finally, St. Elizabeth's asserts that even if the court determines that Friel was the previous owner of the TCU and that Friel operated as a SNF, St. Elizabeth's is still entitled to an exemption because the TCU "relocated" as defined by CMS. *Id.* at 36–41. St. Elizabeth's points out that the TCU draws the majority of its patients from areas that Friel did not serve and that the total inpatient days at the new location were substantially less than at the old location during the year prior to the TCU's relocation. *Id.*

In response, the Secretary first argues that he permissibly interpreted the regulations to define Friel as a previous owner because the regulatory language creating the new provider exemption is ambiguous.

---

7. "[A court's] review in such cases is 'more deferential ... than that afforded under *Chevron.*'" *Wyo. Outdoor Council v. United States* *Forest Service,* 165 F.3d 43, 52 (D.C.Cir.1999) (quoting *Nat'l Med. Enters. Inc. v. Shalala,* 43 F.3d 691, 697 (D.C.Cir.1995)).

Def.'s Mot. at 17–33. Specifically, the Secretary contends that Friel transferred its DON to St. Elizabeth's, and that as a result, St. Elizabeth's merely took over the existing nursing operations of Friel via establishment of the TCU. *Id.* Therefore, the Secretary argues, St. Elizabeth's could not be considered a new provider. *Id.* Second, the Secretary alleges that St. Elizabeth's is not entitled to a new provider exemption because Friel's operations were equivalent to that of an SNF. *Id.* at 33–36. In support of its position, the Secretary notes that Friel provided treatment of pressure ulcers and widespread skin disorders, intra-muscular injections, and rehabilitation services. *Id.* at 35. Thus, argues the Secretary, Friel provided services that fell within the definition of a SNF. *Id.* at 34. Finally, the Secretary asserts that St. Elizabeth's is not entitled to a new provider exemption as a relocated provider because the population Friel served was substantially similar to the population that the TCU currently serves. *Id.* at 36–37. The Secretary observes that Friel and St. Elizabeth's both serve patients in the metropolitan Boston area. *Id.* at 36. Accordingly, the Secretary concludes that St. Elizabeth's does not qualify for an exemption. *Id.*

## 2. The Secretary's Decision to Deny St. Elizabeth's a New Provider Exemption Was Not Arbitrary, Capricious, or Unsupported by Substantial Evidence

 As stated earlier, Section 413.30(e) provides that exceptions to RCLs may be granted to a new SNF, which is defined as "a provider of inpatient services that has operated as a SNF (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than 3 full years." 42 C.F.R. § 413.30(e). Because the Secretary's determinations that Friel was the previous owner of the TCU, Friel operated as the equivalent of a SNF for over 3 years and St. Elizabeth's is not a relocated provider are rationally connected to the facts, the court concludes that the Secretary's decision to deny St. Elizabeth's a new provider exemption was not arbitrary, capricious or unsupported by substantial evidence. 5 U.S.C. § 706(2)(A), (E); M*D Pharm.*, 133 F.3d at 16. The court therefore may not disturb the Secretary's decision. *MD Pharm.*, 133 F.3d at 16.

### a. The Secretary's Finding That St. Elizabeth's established the TCU With Bed Operating Rights Purchased from Friel is Rationally Connected to the Facts.

As a threshold matter, St. Elizabeth's disputes the Secretary's conclusion that St. Elizabeth's established the TCU through purchase of Friel's bed operating rights. Pl.'s Opp'n at 1. In support of this contention, St. Elizabeth's points out that two Massachusetts state officials testified that the TCU opened solely on the basis of new bed operating rights issued by DPH. *Id.*; A.R. 1475, 1554. St. Elizabeth's stresses that whether the TCU opened with operating rights transferred from Friel is a question of state law and that the court should not defer to the Secretary's interpretation of state law. Pl.'s Opp'n at 2. The Secretary responds by noting that the Administrator found, as a matter of fact, that St. Elizabeth's established the TCU through St. Elizabeth's purchase of Friel's bed operating rights. A.R. 10. Thus, the first question to answer is whether the court accepts the Secretary's finding that St. Elizabeth's established the TCU pursuant to a purchase of Friel's bed operating rights.

Under the APA, a district court generally does not engage in fact-finding. *Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C.Cir.1996). Rather, the court determines whether the agency articulated a

rational connection between the facts it found and the choice made. *Id.* In support of the Secretary's conclusion that St. Elizabeth's established the TCU pursuant to a purchase of Friel's bed operating rights, the Secretary notes that St. Elizabeth's paid $350,000 to Friel; on July 3, 1996, Friel executed an instrument of transfer where Friel transferred its bed rights to St. Elizabeth's; Friel gave up its operational rights to the beds and Friel closed after the sale of the operational rights. A.R. 3, 10. Based on these found facts, the court upholds the Secretary's determination that St. Elizabeth's established the TCU with bed operating rights purchased from Friel is rationally connected to the facts of the case. *MD Pharm.*, 133 F.3d at 16.

The court recognizes that the Secretary's conclusion is inconsistent with the views of the DPH director responsible for issuing licenses to health care facilities and DPH's deputy general counsel. Both of these DPH officials opine that St. Elizabeth's established the TCU pursuant to a DON granted under Chapter 203. Pl.'s Mot. at 21. The deputy general counsel further stated that Friel's could not have sold its bed operating rights to St. Elizabeth's because the bed operating rights expired on September 30, 1996. *Id.* The deputy general counsel's conclusion, however, raises two questions: first, why St. Elizabeth's paid $350,000 to Friel and second, why Friel closed if St. Elizabeth's did not in fact purchase its operating rights. Further, the date reflected on the instrument of transfer regarding the bed operation rights is July 3, 1996, well before the state issued a DON to St. Elizabeth's. A.R. at 2571. Moreover, the letter from DPH purporting to grant the DON under Chapter 203 explicitly states that one of the reasons that DPH is issuing the DON is because St. Elizabeth's entered into a binding contract that resulted in Friel's "surrender of its license." *Id.* at 440.

These facts support the Secretary's contention that Friel sold its bed operating rights to St. Elizabeth's.

In light of these facts, the testimony of the state officials does not persuade the court to overturn the Secretary's findings. The fact that some state officials opine that the Secretary's conclusion is inconsistent with their own interpretation of state law does not contradict the court's conclusion that the Secretary's interpretation of *federal* law, namely 42 C.F.R. § 413.30(e), is rationally related to the facts. Accordingly, the court will not disturb the Secretary's findings. *MD Pharm.*, 133 F.3d at 16.

### b. The Secretary's Finding That Friel Was the Previous Owner of the TCU Is Rationally Connected to the Facts

St. Elizabeth's asserts that even if the court concludes that it acquired bed operating rights from Friel, Friel was not the previous owner of a "provider of inpatient services" under § 413.30. Pl.'s Mot. at 25. Specifically, St. Elizabeth's argues that a "provider of inpatient services" unambiguously refers to a health-care institution such as a hospital, home health agency or a SNF. *Id.* at 26. Because St. Elizabeth's only acquired bed operating rights, St. Elizabeth's argues that Friel's previous ownership of these intangible rights does not make Friel the prior owner of the TCU. *Id.* at 25. Therefore, St. Elizabeth's asks the court to find that the TCU has operated as a SNF for less than three full years and is entitled to the new provider exemption to RCLs. *Id.* at 30–31.

The Secretary counters by asserting that the term "provider" is ambiguous and that in light of such ambiguity, the court should defer to the Secretary's interpretation that when one facility takes over the bed operating rights from another facility, there is simply a change in ownership of

the provider and a new provider has not been created. Def.'s Mot. at 25. Consequently, the Secretary argues, a mere change in the ownership that does not create a new SNF does not allow the SNF to take advantage of the new provider exemption. *Id.* at 27.

This court is not the first to address whether § 413.30 is ambiguous, and it is likely that it will not be the last. In fact, this exact question has already been addressed by five circuits. The Seventh, Ninth and First Circuits have held that § 413.30 is ambiguous. *Providence Health Sys.-Wash. v. Thompson*, 353 F.3d 661, 665–66 (9th Cir.2003) (concluding that the interplay between "provider" and "previous ownership" renders § 413.30 ambiguous); *South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 98–102 (1st Cir.2002) (holding that § 413.30 is "manifestly ambiguous"); *Paragon Health Network, Inc. v. Thompson*, 251 F.3d 1141, 1148 (7th Cir.2001) (holding that § 413.30 is ambiguous as to what constitutes a "provider"). In contrast, the Sixth and Fourth Circuits have held that § 413.30 is not ambiguous. *Ashtabula County Med. Ctr. v. Thompson*, 352 F.3d 1090, 1094–95 (6th Cir.2003) (holding that the term "provider" as used in § 413.30 is unambiguous and refers to a business institution that is providing skilled nursing services); *Md. Gen. Hosp., Inc. v. Thompson*, 308 F.3d 340, 343–48 (4th Cir.2002) (concluding that "provider" as used in § 413.30 unambiguously refers to a business institution and not a particular asset of that institution). Given this circuit split, the question of whether or not § 413.30 is ambiguous is a "very close call." *Ashtabula*, 352 F.3d at 1097.

The court's own reading of the regulation leads the court to conclude that the 1st, 7th and 9th Circuits' reasoning is persuasive. While 42 U.S.C. § 1395x defines a "provider of services" as, *inter alia*, a hospital or skilled nursing facility, that same section defines a skilled nursing facility as "[a]n institution (or distinct part of an institution) which is primarily engaged in providing to residents skilled nursing care and related services, or rehabilitation services[.]" 42 U.S.C. §§ 1395i–3(a), 1395x(j). As the 7th Circuit reasoned, because a provider may be merely a distinct part of an institution, a provider can be seen as an amalgamation of tangible things, such as beds and staff, and intangible things such as bed operating rights. *Paragon*, 251 F.3d at 1148. Changes to any of those components may or may not lead one to deduce that a new provider has been created. *South Shore*, 308 F.3d at 98. As the Seventh Circuit explained:

> [I]f a facility fires all its staff and hires a new one, but makes no other changes, an ordinary user of the English language would consider the new staff to be the same "provider" as it was before. Similarly, a SNF that replaced all of its old equipment with new models would still be the same "provider" as it was before the modernization. Even if a SNF both fired its staff and replaced all of its equipment, one might still call it the same "provider" if the administration and physical plant remained the same. Of course, if all the various things that make up a SNF were new in the sense that they had not been part of another facility, then one would have to call that SNF a "new provider."

*Paragon*, 251 F.3d at 1148. The court agrees that because the term "provider" is ill-defined, determining the "previous ownership" of the "provider" is equally unclear. *Id.; Providence Health*, 353 F.3d at 665–66 (citing *Paragon* to find § 413.30 ambiguous); *South Shore*, 308 F.3d at 98 (same).

When an agency regulation is silent or ambiguous, the court must defer to the agency's interpretation as long as it is

reasonable. *Tenet HealthSystems Health-Corp v. Thompson,* 254 F.3d 238, 248 (D.C.Cir.2001). As noted, "this broad deference is all the more warranted when regulation concerns a complex and highly technical regulatory program like Medicare[.]" *Id.* (citing *Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. 2381). In light of this guidance, the court concludes that the Secretary's determination that St. Elizabeth's acquisition of bed operating rights from Friel makes Friel the previous owner of the TCU is rationally connected to the facts of the case. *Paragon,* 251 F.3d at 1149. Thus, the court will not disturb the Secretary's findings. *Tenet,* 254 F.3d at 248; *MD Pharm.,* 133 F.3d at 16.

### c. The Secretary's Finding That Friel Operated as the Equivalent of a SNF During the Three Years Prior to Opening the TCU is Rationally Connected to the Facts

St. Elizabeth's next argues that even if the court concludes that Friel was the previous owner of the TCU, St. Elizabeth's still would be entitled to a new provider exception because Friel did not operate as a SNF or the equivalent. Pl.'s Mot. at 31. As noted earlier, the Medicare Statute defines a SNF as "[a]n institution (or distinct part of an institution) which is primarily engaged in providing to residents skilled nursing care and related services, or rehabilitation services[.]" 42 U.S.C. §§ 1395i–3(a), 1395x(j). In support of its argument, St. Elizabeth's claims that Friel was not primarily engaged in providing skilled nursing or rehabilitative care to its residents. Pl.'s Mot. at 34.

The administrative record reflects the fact that Friel provided skilled services such as treatment of pressure ulcers, intra-muscular injections and rehabilitation services. A.R. 12, 1070–71, 1247, 2005. Moreover, St. Elizabeth's concedes that Friel occasionally provided basic skilled services. Pl.'s Mot. at 34. In light of the substantial deference owed to the Secretary in interpreting Medicare regulations, the fact that Friel provided, at a minimum, a low level of skilled nursing services, leads the court to conclude that the Secretary's finding that Friel operated as the equivalent of a SNF was rationally connected to the Secretary's found facts. *MD Pharm.,* 133 F.3d at 16; *accord Larkin Chase Nursing & Restorative Ctr. v. Shalala,* 2001 WL 34035688, at *9 (D.D.C. Feb.6, 2001) (holding that a nursing facility ("NF") that provided some skilled services was the equivalent of a SNF under § 413.30.) Further, the court notes that Friel was a Medicaid certified nursing facility ("NF"). A.R. 12. Under the Medicare and Medicaid statutes, both NF's such as Friel and SNFs are defined as institutions that are "primarily engaged in providing ... skilled nursing care and related services ... or rehabilitation services." 42 U.S.C. § 1395i–3(a), § 1396r(a). The fact that the Medicare and Medicaid statutes define a SNFs and NFs' functions as virtually identically only bolsters the court's conclusion that the Secretary's finding is rationally connected to the facts of the case. Consequently, the court will not disturb the Secretary's holding. *MD Pharm.,* 133 F.3d at 16.

### d. The Secretary's Finding That St. Elizabeth's Is Not a Relocated Provider is Rationally Connected to the Facts

Finally, St. Elizabeth's contends that it is entitled to a new provider exemption because the TCU's move from the Friel location constituted a relocation. Pl.'s Mot. at 36. As stated previously, regardless of previous ownership, if a provider changes location, the Secretary may grant a new provider exemption so long as the provider can demonstrate that in the new location (1) the new provider serves a substantially different inpatient population

and (2) the total inpatient days at the new location are substantially less than at the old location for a comparable period [of at least three months]. PRM § 2604.1.

In support of its argument, St. Elizabeth's states that its TCU mainly served patients from areas that Friel did not serve. Pl.'s Mot. at 37. St. Elizabeth's points out that (1) 64% of its patients came from the Quincy/Wallaston area whereas only 1.4% of the TCU's patients came from Quincy; (2) Friel did not have patients from any of the towns that accounted for 70% of the TCU's discharges, except for three Boston patients; and (3) that the remaining towns from which Friel drew patients accounted for only 1% of the TCU's discharges. *Id.* at 38–39. In addition, St. Elizabeth's asserts that the Secretary's application of PRM § 2533, which permits a provider to qualify for a new provider exemption only if it moves to another Health Service Area is impermissibly retroactive. *Id.*

While the Secretary mentions the subsequent revision to the PRM in his decision, he specifically stated that his finding that the TCU did not serve the same inpatient population was reasonable and consistent with PRM § 2604.1 because both the TCU and Friel drew patients from the greater Boston area. A.R. 13. Although the Secretary did noted that he did not read § 2533 as conflicting with § 2604.1, he did not base his decision on § 2533. *Id.* St. Elizabeth's TCU serves over 17 times the number of patients that Friel served. *Id.* at 461–63, 1067. Thus, looking only at the percentages of admitted patients can be misleading. The administrative record reflects that both Friel and the TCU drew patients from Quincy, Boston, Hanover,

Rockland, Dorchester, Weymouth, Milton and Marlboro.[8] *Id.* at 461–63, 2137–38; Pl.'s Mot. at 39. Thus the evidence supports the Secretary's conclusion that, at a minimum, over 63% of the towns that sent patients to Friel also sent patients to the TCU. Based on this record, and bearing in mind the substantial deference accorded to the Secretary, the court cannot say that the Secretary's finding was unreasonable. *Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. 2381. Accordingly, the court concludes that the Secretary's determination that Friel and the TCU did not serve a substantially different population was rationally related to the facts, and therefore, the court will not disturb the Secretary's decision. *MD Pharm.,* 133 F.3d at 16.

## IV. CONCLUSION

For the foregoing reasons, the court grants the defendant's motion for summary judgment and denies the plaintiff's motion for summary judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this _____ day of March, 2004.

---

8. The court notes that the administrative record cited by the parties to identify the areas from which Friel drew its patients during its last two years of operation may be incomplete. The record reflects only 22 patients, but other parts of the record indicate that Friel had between 27 and 29 residents during its last year of operation. *Compare* A.R. at 2137–38 *with* A.R. at 1067.