# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 7, 2004             Decided February 4, 2005

No. 04-5092

ST. ELIZABETH'S MEDICAL CENTER OF BOSTON, INC.,
APPELLANT

v.

TOMMY G. THOMPSON, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv00153)

———

*Gregg D. Shapiro* argued the cause for appellant. With him on the briefs was *Robert D. Wick*.

*Anthony A. Yang*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the briefs were *Peter D. Keisler*, Assistant Attorney General, and *Barbara C. Biddle*, Attorney.

Before: EDWARDS, SENTELLE and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*:  St. Elizabeth's Medical Center of Boston ("St. Elizabeth's") appeals from a summary judgment entered by the United States District Court in favor of appellee Thompson, Secretary of Health and Human Services ("the Secretary" or "HHS"), seeking to overturn the Secretary's administrative decision that St. Elizabeth's was not entitled to an exemption from limitations on Medicare reimbursements to a new skilled nursing facility ("SNF").  The Secretary's decision to deny St. Elizabeth's the exemption was based on his conclusion that the St. Elizabeth's SNF was not a "new provider" within the meaning of the governing regulation, because it was opened with operating rights acquired from a pre-existing nursing facility which was a SNF or its equivalent.  Because the Secretary's conclusion that the pre-existing nursing facility was a SNF or its equivalent was not supported by sufficient evidence, we hold that St. Elizabeth's, not the appellee, was entitled to summary judgment.  We reverse the judgment, and direct the remand of the administrative proceedings to HHS for a determination of other related issues.

## I. Glossary

Because of the numerous acronyms and terms of art employed in this opinion, we provide a brief glossary.

| | |
|---|---|
| APA | Administrative Procedure Act |
| CMS | Centers for Medicare and Medicaid Services |
| HCFA | Health Care Financing Administration |
| HHS | Department of Health and Human Services |
| NF | nursing facility |
| PRM | Provider Reimbursement Manual |

| PRRB | Provider Reimbursement Review Board |
|------|-------------------------------------|
| RCLs | reasonable cost limits |
| SNF | skilled nursing facility |
| St. Elizabeth's | St. Elizabeth's Medical Center of Boston (Appellant) |
| TCU | transitional care unit |

## II. Background

A. *Regulatory Scheme*

The Social Security Act provides for the reimbursement of "reasonable costs" of care for Medicare patients–primarily the elderly and certain disabled people–to Medicare-certified skilled nursing facilities. *See* 42 U.S.C. § 1395 *et seq*. The Centers for Medicare and Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration ("HCFA")), administers Medicare on the Secretary's behalf. *See Community Care Foundation v. Thompson*, 318 F.3d 219, 221 (D.C. Cir. 2003).

Seeking to encourage Medicare-certified providers to operate efficiently, Congress has instructed the Secretary of HHS (who now acts through CMS) to cap payments under these programs at what he determines to be reasonable cost limits ("RCLs"), *see* 42 U.S.C. § 1395f(b), and apply statutory norms in the determination, *see* 42 U.S.C. § 1395x(v); *see also* 42 U.S.C. § 1395yy (setting specific norms for the determination of RCLs for SNFs). With respect to reimbursements for routine care at SNFs, the Secretary is authorized to establish appropriate exemptions to these caps. *See* 42 U.S.C. § 1395yy(c). One such exemption is the "new provider exemption," which allows providers of skilled nursing services to receive reimbursement at a higher rate for the first two years of operation. *See* 42 C.F.R. § 413.30(e) (1997) (now codified at 42 C.F.R. §

413.30(d)).  According to the Provider Reimbursement Manual ("PRM"), a compilation of interpretive rules published by HHS, *see St. Luke's Hospital v. Thompson*, 355 F.3d 690, 692 (D.C. Cir. 2004), the new provider exemption "was implemented to recognize the difficulties in meeting the applicable cost limits due to underutilization during the initial years of providing skilled nursing and/or rehabilitative services[.]"  HCFA Pub. 15-1, § 2533.1(A).  Put another way, the exemption was meant to "allow a [new] provider to recoup the higher costs normally resulting from low occupancy rates and start-up costs during the time it takes to build its patient population."  *Paragon Health Network v. Thompson*, 251 F.3d 1141, 1149 (7th Cir. 2001).

The new provider exemption provided at the time that:

Exemptions from the limits imposed under this section may be granted to a new provider  . . . .  A new provider is a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified under Medicare, under present and previous ownership, for less than three full years.

42 C.F.R. § 413.30(e) (1997).  This means that, to qualify for the new provider exemption, a facility must show that it is either (1) new, or (2) operating for the first time as a SNF or equivalent.  It follows logically that facilities that (1) have operated before under "present or previous ownership," *and* (2) have operated as a SNF or equivalent, cannot qualify as "new providers."  In some instances, the new provider exemption may also be available to relocated providers, provided they can show that "in the new location a substantially different inpatient population is being served."  PRM § 2604.1.

Given the complex state and federal administrative schemes that nursing care providers must navigate to set up a SNF, it is

not always obvious whether a newly opened facility has operated before under previous ownership. Several states, for example, require that new facilities purchase the right to offer the new beds they plan to make available, so as to keep the total number of nursing home beds in the state constant. *See, e.g., Ashtabula County Medical Center v. Thompson*, 352 F.3d 1090, 1092 (6th Cir. 2003) (describing Ohio "certificate of need" ("CON") program); *Maryland General Hospital, Inc. v. Thompson*, 308 F.3d 340, 342-43 (4th Cir. 2002) (describing Maryland's CON program); *Paragon Health Network*, 251 F.3d at 1143 (describing Wisconsin's CON program). But our sister circuits have split over whether it is reasonable for CMS to attribute operation under previous ownership to a newly opened SNF solely because it acquired such rights. *Compare Maryland General Hospital*, 308 F.3d at 345 (4th Cir.) (unreasonable), *with Providence Health System v. Thompson,* 353 F.3d 661, 666-68 (9th Cir. 2003) (reasonable); *South Shore Hospital Inc. v. Thompson*, 308 F.3d 91, 105-06 (1st Cir. 2002) (reasonable); *Paragon Health Network*, 251 F.3d at 1149-50 (7th Cir.) (reasonable). There is no definitive court precedent as to what it means to operate as a SNF or its equivalent.

B. *Factual and Procedural Background*

In 1996, St. Elizabeth's opened a transitional care unit ("TCU") using operating rights purchased from the Friel Nursing Home, an extant nursing home in Quincy, Massachusetts. St. Elizabeth's purchased those operating rights for the sole purpose of obtaining a determination of need ("DON") from the Massachusetts Department of Public Health–then necessary under state law to opening a new nursing facility. (At the time, Massachusetts had imposed a moratorium on creating new nursing home beds in the state, which meant that anyone seeking to open new nursing facilities had to first obtain the operating rights to existing nursing beds.) Before St.

Elizabeth's opened the TCU in October of that year, Friel ceased operations completely.

The TCU, which qualifies as a SNF under the Medicare statute, 42 U.S.C. § 1395x(j), *see* HHS Letter of November 27, 1996, provides rehabilitative care for patients recovering from major surgery who "no longer require the intensity and scope of invasive procedures, yet, have complex medical and therapeutic management needs . . . ." Dep. of Francis X. Campion at 240 (Jan. 30, 2001), *reprinted in* J.A. 729. In other words, the TCU is intended for (mainly elderly) patients who need short-term care and rehabilitation after surgery, but will eventually return to their own homes, or transfer to long-term care facilities for less intensive care. Patients in the TCU are attended by a team of physicians, nurses, physical, occupational and speech therapists, and social workers, and stay an average of 10-15 days.

In January 1997, St. Elizabeth's applied to CMS for the new provider exemption for the new TCU. CMS denied St. Elizabeth's request, on the basis that (1) the TCU "was established due to the purchase and relocation of 29 long term care beds from [Friel]," which (2) as a Medicaid-certified nursing facility ("NF"), provided the same "type of services" as the TCU. HHS Letter of June 23, 1997. In other words, CMS determined that because the TCU acquired operating rights from Friel, it in effect operated previously under other ownership. Further, CMS determined that Friel's status as a nursing facility qualified it as a SNF or its equivalent. Because, according to CMS, the TCU had operated before under "present or previous ownership" as a SNF or equivalent, it could not qualify as a "new" provider under 42 C.F.R. § 413.30(d). The CMS further concluded that the TCU was not entitled to the new provider exemption as a relocated facility, because the TCU's inpatient population was not substantially different from Friel's.

St. Elizabeth's appealed this decision to the Provider Reimbursement Review Board ("PRRB"), which reversed the CMS, determining that the TCU *was* entitled to the new provider exemption because mere "acquisition of bed rights" did not amount to an existing facility changing hands. HHS PRRB Dec. No. 2002-D49 (Sept. 30, 2002), *reprinted in* J.A. 83 at 117, 119.

In December 2002, the Secretary, acting through the CMS Administrator, reversed the PRRB's decision. Decision of the Administrator, Review of PRRB Dec. 2002-D49. In January 2003, St. Elizabeth's filed suit in the U.S. District Court for the District of Columbia, challenging the Administrator's decision as arbitrary and capricious in violation of section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* Complaint, J.A. at 1. The District Court heard the challenge under 42 U.S.C. § 1395oo(f), which provides for judicial review of the final HHS decision.

In its complaint, St. Elizabeth's argued that the decision was arbitrary and capricious, and unsupported by substantial evidence on three main grounds: (i) Friel's operating rights were never actually transferred to the TCU; (ii) even if they were transferred, the TCU was a "new provider" because transfer of bed operating rights did not amount to a transfer of ownership, and Friel never operated as a SNF; and (iii) regardless, the TCU qualified for the PRM's relocated provider exemption. J.A. at 13. Resolving cross motions for summary judgment, the district court ruled in favor of HHS, on the basis that "the Secretary's determinations that Friel was the previous owner of the TCU, Friel operated as the equivalent of a SNF for over 3 years and St. Elizabeth's is not a relocated provider [we]re rationally connected to the facts[.]" 307 F. Supp. 2d 73, 80 (D.D.C. 2004).

St. Elizabeth's appeals from that decision, reasserting the arguments made in its original complaint before the District Court. We have jurisdiction under 28 U.S.C. § 1291, and reverse on the basis that the Administrator lacked substantial evidence to conclude that Friel operated as a SNF or its equivalent. We therefore conclude that St. Elizabeth's was entitled to the new provider exemption.

### III.  Discussion

A. *Standard of Review*

The Administrator's decision can be set aside only if it is "unsupported by substantial evidence," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(E); *see* 42 U.S.C. § 1395oo(f)(1) (providing that judicial review of HHS reimbursement decisions shall be made under APA standards).  Because we apply the same standard of review as the district court, we proceed de novo, as if the case were before us on direct appeal from the administrative hearing below.  *Tenet Healthsystems Healthcorp v. Thompson*, 254 F.3d 238, 244 (D.C. Cir. 2001).

B. *Equivalent Provider Status*

As related above, CMS concluded that the St. Elizabeth's TCU did not qualify for the new provider exemption because (1) the fact that it was opened using operating rights acquired from Friel meant it had already been in operation under prior ownership, and (2) Friel "was an equivalent provider of skilled nursing and/or rehabilitative services."   Decision of Administrator at 11.   Under the terms of the governing regulation, both conclusions had to be made to disqualify the TCU from the exemption. *See* 42 C.F.R. § 413.30(e) (1997).

To come to the second conclusion–that Friel operated as a SNF or its equivalent–CMS relied primarily on the fact that Friel was a Medicaid-certified NF and operated as such. *Id*. Specifically, the Administrator reasoned:

> [B]oth Medicare SNFs and Medicaid NFs are required to provide directly or indirectly, the same basic range of services. These ranges of services include those nursing services and specialized rehabilitative services needed to attain or maintain each resident's highest practicable level of physical, mental, and psychological well-being. Consequently, the fact that the prior owner of the [TCU's] DON rights was a NF supports the conclusion that it [was] clearly an equivalent provider of skilled nursing and/or rehabilitative services . . . .

*Id.* As a comparison of the statutory definitions of NFs and SNFs reveals, this reasoning is flawed. The Medicaid statute defines a NF as:

> An institution (or a distinct part of an institution) which
>
>> (1) is primarily engaged in providing to residents:
>>
>>> (A) skilled nursing care and related services for residents who require medical or nursing care,
>>> (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, *or*
>>> (C) on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities . . . .

42 U.S.C. § 1396r(a) (emphasis added).   In contrast, Medicare defines a SNF as an institution that:

> (1) is *primarily* engaged in providing to residents--
>
>> (A)  skilled  nursing  care  and  related  services  for residents who require medical or nursing care, or
>> (B)  rehabilitation  services  for  the  rehabilitation  of injured, disabled, or sick persons,  and is not primarily for the care and treatment of mental diseases. . . .

42 U.S.C. § 1395i-3(a) (emphasis added).

It is evident that the range of services provided by a NF can encompass skilled nursing or rehabilitative care.  Some facilities may, indeed, qualify as both NFs and SNFs.  However, a facility must be *primarily* engaged in providing skilled nursing or rehabilitative care to qualify as a SNF, whereas a facility need not even offer such services at all to qualify as a NF.  Thus, the bare fact that an institution has gained NF status or is operating as a NF, without more, is not sufficient to qualify the NF as a SNF or its equivalent.  To do so, a NF would additionally have to be "primarily engaged in providing . . . skilled nursing care and related services . . . or rehabilitation services . . . ."  42 U.S.C. § 1395i-3(a)(1).

The record evidence is all to the effect that Friel was primarily engaged in providing custodial care to its residents; it does not show that Friel was primarily engaged in providing skilled nursing and/or rehabilitative services.  The Government points out that Friel provided some treatment of bed sores, vitamin injections, and some unspecified rehabilitation as skilled nursing care, *see* Govt. Br. at 52–54.  But the underlying documentary evidence as to the provision of these services suffices  only  to  show  that  Friel  occasionally  provided  this

limited range of services. Thus, the CMS conclusion that Friel was a SNF or equivalent must be overturned for lack of substantial evidence, under 5 U.S.C. § 706(E)(2).

C. *Remedy*

Because the second CMS decision, representing the final HHS decision, is invalid, we reinstate the September 30, 2002 PRRB decision granting the TCU the new provider exemption. HHS PRRB Dec. No. 2002-D49. But one final question remains to be answered: Is the St. Elizabeth's TCU entitled to reimbursement for the costs above the reasonable cost limits that it incurred in just 1997, or for the successive fiscal year, as well. (Recall that the new provider exemption covers new facilities for their first two years of operation.) St. Elizabeth's argues that it is entitled to additional monies for both years, because the exemption "has a defined multi-year period of duration." Aplt. Br. at 62. The Government responds that this court can only order additional reimbursement for the fiscal year ending in September 1997, because, when it started the administrative appeal process, St. Elizabeth's had only received a CMS opinion on reimbursement for that year. Govt. Br. at 58. The Government further contends that we have no jurisdiction over any subsequent cost reporting period(s), because St. Elizabeth's only exhausted administrative remedies for 1997. *Id.* at 59.

This isn't quite true. In a separate jurisdictional decision, the PRRB determined that its decision, if rendered in favor of the TCU, would apply to "multiple fiscal years." HHS PRRB Jurisdictional Decision in Case No. 98-0489, *reprinted in* J.A. 131, 133. Which years, exactly, remains to be decided, as the PRRB reserved the right to determine the specific cost-reporting periods for which the TCU is entitled to the exemption "should it find for the [TCU] with regard to the substance of the issue under dispute." *Id*. The PRRB has not yet done so. The

Government is right, in a sense, that we do not have jurisdiction over the issue of the specific years for which the TCU is entitled to additional reimbursement, because there has therefore been no final agency decision on that count. But insofar as it is arguing that we can only order reimbursement for the fiscal year ending in September 1997, the Government is incorrect. Now that the substantive decision as to the TCU's entitlement to the new provider exemption has been reinstated, the PRRB should proceed, as it reserved the right to do, to determine the exact years for which St. Elizabeth's is entitled to reimbursement. While this would seem a simple task under the statute, it is the task of the PRRB, not the courts.

## IV. Conclusion

The Secretary's determination, through the CMS, that St. Elizabeth's was not entitled to the new provider exemption to reasonable cost limits for Medicare reimbursement is not supported by substantial evidence, because there was no evidentiary basis for the conclusion that Friel operated as a SNF or its equivalent. The district court erred in concluding otherwise. Accordingly, we reverse the summary judgment. We further order that the case be remanded to the Department of HHS for a formal determination of the cost-reporting periods to which that decision applies.